In re Philip PRICHARD, Constance Prichard, Debtors.

**HERKIMER COUNTY TRUST COMPANY, Plaintiff,**

v.

Mark SWIMELAR, Esq. in his capacity as the Chapter 13 Bankruptcy Trustee of the above named debtors; Randy Schaal, Esq. in his capacity as the Chapter 7 Bankruptcy Trustee of the above named debtors, Defendants.

Bankruptcy No. 92–00529.
Adv. No. 94–70003A.

United States Bankruptcy Court,
N.D. New York.

July 7, 1994.

David L. Ganje, Albany, NY, for Herkimer County Trust Co.

Mark Swimelar, Chapter 13 Trustee, Syracuse, NY.

Randy J. Schaal, Chapter 7 Trustee, Sherrill, NY.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

The Court considers the motion of the Plaintiff, Herkimer County Trust Company ("HCT"), for summary judgment, filed in the within adversary proceeding, declaring that Mark Swimelar, Esq., in his capacity as Chapter 13 trustee ("Swimelar") and Randy Schaal, Esq., in his capacity as Chapter 7 trustee ("Schaal") (hereinafter jointly referred to as the "Trustees"), are obligated to turn over to HCT the proceeds from the sale of certain collateral formerly owned by Philip and Constance Prichard ("Debtors").

The motion was heard before the Court on March 29, 1994, at a regular motion term in Utica, New York. The Court did not request the filing of memoranda of law and the matter was submitted for decision that same day.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(A).

### FACTS

On March 2, 1988, Debtors made and delivered a promissory note to HCT, executing a security agreement ("Security Agreement") granting HCT a security interest in collateral described as "all Norwegian Fjord Horses owned or thereafter acquired" by the Debtors ("Collateral"). *See* Exhibit "A" of HCT's Affidavit, dated February 15, 1994 ("HCT Affidavit").

The so-called "dragnet clause" in the Security Agreement provides

To secure the payment and performance of all of the Obligations, Borrower hereby grants to Bank a continuing security interest in, and assigns and pledges to Bank, the Collateral. *See* Security Agreement ¶ 1(a).

"Obligations" is defined to include

all indebtedness, liabilities, obligations, covenants and duties of Borrower to Bank ... of every kind, nature and description, direct or indirect, absolute or contingent, due or not due, contractual or tortious, liquidated or unliquidated, arising by operation of law or otherwise, now existing or hereafter arising, and whether or not evidenced by any note or other instrument or agreement and whether or not for the payment of money including, but not limited to, indebtedness, obligation and liabilities to Bank ... *See* Security Agreement ¶ 1(b)(ii)

Paragraph 11 of the Security Agreement provides

(a) This Agreement shall be a continuing agreement and shall apply to all future Obligations, notwithstanding that at any particular time all of the Obligations then outstanding shall have been paid in full.

(b) This Agreement shall continue in full force and effect until written notice of termination shall have been received by the Bank ... but, notwithstanding any such notice, this agreement shall continue in full force and effect until all Obligations then outstanding (whether absolute or contingent) shall have been paid in full and all rights of Bank hereunder shall have been satisfied or other arrangements for the securing of such rights satisfactory to Bank shall have been made ...

On March 11, 1988 and March 14, 1988, HCT perfected its security interest by filing the

appropriate financing statements. *See* Exhibit "B" of HCT Affidavit.

The Debtors subsequently executed a note and mortgage in favor of HCT in the amount of $180,000 on June 27, 1989, encumbering real property located in the Town of Newport, County of Herkimer, State of New York ("Property"). A second note and mortgage secured by the Property in the amount of $40,000 was executed by the Debtors on November 22, 1989, also in favor of HCT. *See* Attachments to Exhibit "C" of HCT Affidavit. According to a recent appraisal, the Property has a fair market value of $195,000. *See* Exhibit "K" of HCT Affidavit. HCT presently holds claims in the approximate sum of $212,693.09. *See* ¶ 10 of HCT Affidavit.[1]

On February 20, 1992, the Debtors filed a voluntary joint petition seeking relief under Chapter 13 of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code"). The case was converted to one under Chapter 7 of the Code on October 20, 1993.

The Collateral was sold during the course of the Chapter 13 proceeding. The Debtors delivered $6,000 in proceeds from the sale to Swimelar. An additional $14,000 in proceeds was delivered to Schaal during the course of the Chapter 7 proceeding in 1993. *See* Exhibit "F" of HCT Affidavit.

On or about January 3, 1994, HCT commenced this adversary proceeding against both Trustees pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P.") and Code §§ 552(b) and 554 to recover the proceeds from the sale of the Collateral totalling $20,000 ("Proceeds"). The initial loan of March 2, 1988, secured by the Collateral was satisfied in full from monies obtained by HCT from a checking account of the Debtors pursuant to an Order of this Court on January 10, 1994. *See* Exhibit "E" of HCT Affidavit. Said Order also granted HCT relief from the automatic stay so as to permit it to commence an action for foreclosure and sale of the Property in state court. That action is apparently still pending

in New York State Supreme Court, County of Herkimer. *See* Exhibit "C" of HCT Affidavit.

### ARGUMENTS

■ HCT makes the argument that the Security Agreement was clear and unambiguous and granted HCT a continuing security interest in the Collateral and any proceeds derived therefrom with respect to any obligations owed by the Debtors to HCT, including the notes and mortgages secured by the Property. HCT maintains that even though the original loan was paid off in full, HCT's lien on the Proceeds continues by the expressed terms of the Security Agreement. Therefore, it is HCT's position that the Proceeds received by the Trustees from the Debtors should be turned over to HCT.

The Trustees[2] assert that once the note of March 2, 1988, was satisfied, HCT no longer had the right to enforce the "dragnet clause" in the Security Agreement. The Trustees contend that the Proceeds are surplus monies belonging to the estate for distribution to unsecured creditors.

Should the Court determine that HCT has a security interest in the Proceeds, the Trustees also contend that HCT, having obtained relief from the automatic stay on the Property, as well as other inventory of the Debtors ("Inventory"), has an obligation to liquidate both before seeking to recover the Proceeds.

### DISCUSSION

Summary judgment pursuant to Fed. R.Bank.P. 7056, which incorporates by reference Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), shall be granted if the Court finds, after reviewing the pleadings and other documents on file, that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Hudson Hotels Corp. v. Choice Hotels Intern.*, 995 F.2d 1173, 1175 (2d Cir.1993) (quoting Fed.

---

1. The proof of claim filed by HCT on December 21, 1993, indicates a secured debt in the amount of $214,480.41. *See* Claim No. 57A.

2. Swimelar has indicated that he will rely on the affidavit submitted by Schaal in opposition to HCT's motion for summary judgment.

R.Civ.P. 56(c)). The burden is on the movant to establish that no genuine issue of material fact exists. *Id.*

In ruling on the motion, the central issue before the Court is whether the "dragnet clause" found in the Security Agreement executed on March 2, 1988, remains in effect, thereby entitling HCT to recover the Proceeds from the sale of the Collateral after the original loan was paid in full and apply them in partial satisfaction of the notes on the Property.

HCT acknowledges that the initial loan of March 2, 1988, has been fully satisfied pursuant to an Order of this Court on January 10, 1994, which authorized HCT to set off monies held by HCT in a checking account of the Debtors. *See* ¶ 14 and 26 of HCT Affidavit. There is also no factual dispute concerning the existence of the Security Agreement granting HCT a security interest in the Collateral and any proceeds therefrom, which was properly perfected by filing financing statements in the appropriate offices. *See* Exhibits "A" and "B" of HCT's Affidavit.

█ The language of security agreements is to be interpreted as written. *See generally In re Gordon Car and Truck Rental, Inc.,* 75 B.R. 466, 472 (Bankr.N.D.N.Y.), *aff'd* 80 B.R. 12 (N.D.N.Y.1987). Under New York law, a "dragnet clause" is valid if clear and unambiguous. *See In Matter of Riss Tanning Corp.,* 468 F.2d 1211, 1213 (2d Cir. 1972). The Court should "neither interpret away the obvious meaning of the words involved nor supply additional meanings to them." *Id.*

In this instance, the "dragnet clause" in the Security Agreement grants HCT a continuing security interest in the Collateral to secure the payment of all obligations. *See* ¶ 1(a) of Security Agreement. "Obligations" is clearly defined to include all indebtedness of every kind, nature and description "now existing or hereafter arising." *See* ¶ 1(b)(ii) of the Security Agreement. The "dragnet clause" was valid and effective to continue HCT's security interest in the Collateral even after the original note was satisfied since the Debtors had incurred other subsequent indebtedness which remained unpaid. *See Nat'l Bank of Northern New York v.*

*Shaad,* 60 A.D.2d 774, 775, 400 N.Y.S.2d 965, 966 (4th Dep't 1977); *see also Reich v. Bowery Sav. Bank,* 183 A.D.2d 884, 583 N.Y.S.2d 978 (2d Dep't), *leave to appeal denied* 80 N.Y.2d 758, 602 N.E.2d 1124, 589 N.Y.S.2d 308 (1992) (Bank entitled to retain as security for corporate loan the collateral from borrower's personal loan after personal loan was paid in full.) This conclusion finds additional support in ¶ 11 of the Security Agreement, which expressly states that the agreement was to apply to "all future Obligations, notwithstanding that at any particular time all of the Obligations then outstanding shall have been paid in full." *See* ¶ 11(a) of Security Agreement. The Security Agreement was to "continue in full force and effect until all Obligations then outstanding ... shall have been paid in full ..." *See* ¶ 11(b) of Security Agreement.

Based on the clear and unambiguous language of the Security Agreement, it is the conclusion of this Court that as a matter of law, HCT retains a continuing security interest in the Collateral and any proceeds therefrom. The question then remains whether HCT is first required to sell the Property and the Inventory before seeking to recover the Proceeds in the possession of the Trustees.

█ The Trustees are apparently asking this Court to render a determination with regard to the marshaling of the Debtors' remaining assets. "[M]arshaling assets is an equitable doctrine developed to prevent injustice to junior creditors and foster fair dealing, justice and common honesty." *In re Craner,* 110 B.R. 111, 122 (Bankr.N.D.N.Y. 1988) (citing 53 AM.JUR.2D *Marshalling Assets* § 4 (1970)), *rev'd in part on other grounds,* 110 B.R. 124 (N.D.N.Y.1989). The doctrine "deals with all who have an interest in the property involved and is applied only when it can be equitably fashioned as to all of the parties." *In re Vermont Toy Works, Inc.,* 82 B.R. 258, 290 (Bankr.D.Vt.1987) (quoting *Meyer v. United States,* 375 U.S. 233, 237, 84 S.Ct. 318, 321, 11 L.Ed.2d 293, 297 (1963)), *rev'd on other grounds,* 135 B.R. 762 (D.Vt.1991); *see also Craner, supra,* 110 B.R. at 122.

To apply the doctrine, three elements must be present: (1) the existence of two or more creditors of the same debtor; (2) the existence of multiple funds belonging to the debtor; and (3) the ability of one creditor to satisfy its claims from all of the funds. *See id.* (citation omitted).

The first element requires that there be two or more creditors of the same debtor. An unsecured creditor has no standing to invoke the doctrine. *See id.* at 123. However, pursuant to Code § 544(a), a trustee may invoke the doctrine by virtue of his/her status as a hypothetical lien creditor. *Toy Works, supra,* 82 B.R. at 295, citing *In re Tampa Chain Co., Inc.,* 53 B.R. 772 (Bankr.S.D.N.Y.1985). Accordingly, Schaal, as Chapter 7 trustee, as well as HCT, are both secured creditors of the Debtors, and Schaal has standing to request that the Court marshal the Debtors' assets. The second and third elements are also met to the extent that there are multiple assets from which HCT could satisfy its claim, including the Property, the Inventory, and the Proceeds.

If it is shown that the creditor holding a superior lien will be delayed or inconvenienced in the collection of its debt, the doctrine cannot be applied. *Craner,* 110 B.R. at 123 (citation omitted); *see also In re Century Brass Prod., Inc.,* 95 B.R. 277, 279 (D.Conn. 1989). In *Tampa* the trustee was holding $156,000 in proceeds realized upon the sale of the debtor's inventory. *Tampa, supra,* 53 B.R. at 777. The secured creditor was owed approximately $121,532 secured by the inventory, as well as a co-op owned by guarantors of the corporate (debtor's) debt. *Id.* at 780. In *dicta* the court noted that "it is a traditional canon of the marshaling doctrine that the senior creditor will not be required first to proceed against the singly charged fund (the Reichard co-op) if foreclosure is required where the doubly-charged fund (the proceeds held by the Trustee) is more directly available by being easily reduced to money." *Id.* The court went on to acknowledge an exception whereby marshaling of the debtor's assets can be ordered if there is no evidence of difficulties in foreclosing that were not foreseen when the loan was first made which would unduly delay satisfaction of the creditor's claim. *Id.* In *Tampa* the court ordered that the creditor proceed first against the co-op, which had an estimated value of $300,000. In reaching its decision, the court found that the creditor was not likely to have difficulty in satisfying its claim from the co-op, particularly as it had available to it "speedier remedies than the foreclosure process," including the sale of the co-op by selling the stock and assigning the lease at a private or public sale. *Id.* The trustee had also agreed to set aside funds of the estate in the event that the creditor was unsuccessful in foreclosing on the co-op or the co-op did not yield a sufficient amount to pay the debt in full. *Id.* at 781.

The matter presently before the Court is to be distinguished from *Tampa,* however. HCT has no other remedy with respect to the Property than to foreclose on it. There is no indication that monies have been set aside to pay HCT should a foreclosure sale not yield sufficient monies to pay its claim in full. As of the date of the motion herein, Schaal apparently has been unsuccessful in his efforts to obtain a purchaser for the Property through the normal brokering process although he indicates having received purchase offers in excess of $214,480.41, the amount set forth in HCT's proof of claim filed December 21, 1993. Delay is inherent in the foreclosure process. Clearly, HCT would be inconvenienced if it were to have to await a foreclosure sale before obtaining partial recovery on its claim. It would be inequitable for the Court to require HCT to first proceed against the Property and the Inventory. HCT should be afforded the choice of how it wishes to allocate its secured claim. Accordingly, HCT is to be permitted to allocate its debt first to the Proceeds, while continuing the foreclosure proceedings in state court.

Based on the foregoing reasons, it is

ORDERED that the motion by HCT for summary judgment is hereby granted requiring that the Trustees forthwith turn over the $20,000 in Proceeds, with any interest accrued thereon, to HCT; and it is further

ORDERED that following liquidation of the Property and Inventory, HCT shall provide Schaal as Chapter 7 trustee with a written accounting and any surplus remaining after its claim has been fully satisfied shall be paid over to Schaal for the benefit of unsecured creditors.